**VALKERING, U.S.A., INC., a Corporation, Petitioner,**

v.

**UNITED STATES DEPARTMENT OF AGRICULTURE; United States of America, Respondents.**

No. 94–1632.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 14, 1994.

Decided Feb. 21, 1995.

William J. Klimisch, Yankton, SD, argued, for petitioner.

Stephen M. Reilly, Office of Gen. Counsel, of Washington, DC, argued, for respondents.

Before MAGILL, Circuit Judge, JOHN R. GIBSON, Senior Circuit Judge, and LOKEN, Circuit Judge.

JOHN R. GIBSON, Senior Circuit Judge.

Valkering, U.S.A., Inc. appeals from a decision and order rendered by the Secretary of the United States Department of Agriculture in favor of the USDA which assessed Valkering a civil penalty of $14,500. The Secretary assessed the penalty for Valkering's involvement in nineteen horticultural shipments, totaling over 7,800 trees, in violation of the Plant Quarantine Act, 7 U.S.C. §§ 161, 162 (1988), the Federal Plant Pest Act, 7 U.S.C. §§ 150dd, 150ee (1988), and the regulations promulgated thereunder, 7 C.F.R. §§ 301.45–301.45–12 (1994). Valkering contends that the penalty was unwarranted by the facts, contrary to its constitutional rights, and excessive. We affirm the decision and order of the Secretary.[1]

Valkering is in the business of wholesaling nursery products to retailers and has been involved in that business since 1986. Valkering received orders from retail merchants for the purchase of potted evergreens. Generally, Valkering purchased the potted evergreens through Butternut Creek Sales, Inc.

In late fall of 1990 or early spring of 1991, Valkering received a large order from K–Mart for three or four foot tall evergreen trees. Michael Nassif, a sales agent for Valkering, contacted Unique Nursery and Garden Center to arrange for the purchase of the evergreens. Butternut, the sales agent for Unique, then contacted Nassif and

---

1. The Judicial Officer Donald A. Campbell, on behalf of the Secretary of Agriculture, issued the final decision and order in this case. The J.O. is an official of the U.S.D.A., and is delegated authority to act as the final deciding officer in adjudicatory proceedings.

it was agreed that Butternut would act as broker for the trees being purchased from Unique for K–Mart, and that Butternut would receive a commission on each tree. In February or March of 1991, Nassif met with a Butternut representative, and Butternut made clear that Unique would take care of all state and federal inspections. Nassif was aware that federal inspections were required and was familiar with USDA inspection procedures.

Pursuant to the agreements Valkering had with Butternut and Unique, either Butternut or Unique was responsible for digging and shipping the trees. Valkering bought all of its evergreens for non-K-Mart sales from Butternut. Valkering bought all of its evergreens for K–Mart sales directly from Unique, with Butternut receiving a commission as Unique's sales agent. There were ten shipments of trees from Unique's facilities to various K–Marts under Valkering's agreement with Unique, and nine shipments from Unique's facilities to Valkering's non-K-Mart customers under Valkering's agreement with Butternut.

In March 1992, the Acting Administrator of the Animal and Plant Health Inspection Service (APHIS) filed a complaint against Valkering alleging nineteen violations of the Plant Quarantine Act, the Federal Plant Pest Act, and the gypsy moth quarantine regulations. In April 1992, a hearing was held before an Administrative Law Judge. The ALJ received into evidence 305 documents submitted by the agency and three documents submitted by Valkering. The ALJ found that Valkering was a participant in the illegal movement of the trees in question and ordered a civil penalty of $5,000.

Valkering appealed the decision to the Secretary. In the reply to Valkering's appeal, APHIS requested that the Secretary review the ALJ's imposition of a civil penalty of only $5000. In February 1994, the Secretary, acting through the Judicial Officer, affirmed the ALJ's decision. The Secretary found that in nine of the nineteen alleged violations (shipments to non-K-Mart customers), Valkering purchased the trees from Butternut and did not know that the trees came from a quarantined area. The Secretary also found that in ten of the nineteen violations (shipments to K–Mart), Valkering knew that the trees were coming from Unique, which was in a quarantined area. The Secretary increased the civil penalty from the $5000 imposed by the ALJ to $14,500. Valkering then appealed to this court.

## I.

First, Valkering argues that the Secretary's decision and order was unsupported by substantial evidence. Valkering contends that it could not properly be held liable for violating the regulations, because it played no role in the actual shipment of the trees, had delegated all responsibility for compliance with state and federal inspection requirements to Unique and Butternut, and was a wholesaler rather than a broker in the transactions.

The Secretary's decision must be upheld if it is supported by substantial evidence. *Cox v. United States Dept. of Agric.*, 925 F.2d 1102, 1104 (8th Cir.), *cert. denied*, 502 U.S. 860, 112 S.Ct. 178, 116 L.Ed.2d 141 (1991). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)).

In fining Valkering, the Secretary concluded that "[i]n order to have the necessary degree of compliance with the gypsy moth program, it is necessary to require each person involved in the movement of a regulated article to take responsibility for complying with the certification procedures." *In re Unique Nursery and Garden Center*, USDA PQ Docket No. 92–84, at 66 (Feb. 8, 1994). Thus, the Secretary read the regulation as imposing a positive duty on Valkering to prevent the spread of gypsy moths in any transaction in which it was involved. We must accept an agency's interpretation of its own regulations, "if it is reasonable in terms of the words of the regulation and the purposes of the statute." *Baker v. Heckler*, 730 F.2d 1147, 1149 (8th Cir.1984); *Missouri, Dept. of Social Service v. United States Dept. of Educ.*, 953 F.2d 372, 375 (8th Cir.1992).

The gypsy moth quarantine regulations, as promulgated under the PQA and FPPA, prohibit the movement of trees from quarantined areas to non-regulated areas in the continental United States without a certificate or permit. 7 C.F.R. § 301.45–4(a). Further, the regulations provide that:

No common carrier or other person may move interstate from any generally infested area any regulated article ... except in accordance with the conditions prescribed in this subpart.

7 C.F.R. § 301.45(b).

The regulations define move as:

Shipped, offered for shipment to a common carrier, received for transportation or transported by a common carrier, or carried, transported, moved, or allowed to be moved by any means.

7 C.F.R. § 301.45–1.

The regulation's broad definition of "move" to include "moved or allowed to be moved by any means," could be reasonably interpreted to encompass Valkering's involvement in the transactions for which they were fined. It is irrelevant whether Valkering's involvement is characterized as that of a wholesaler or broker. Furthermore, the Secretary's interpretation of the regulation is consistent with the purpose of the PQA which is to "prevent the introduction of injurious plant diseases or insect pests and avoid the spread of certain dangerous plant diseases or insect infestations." H.R.Rep. No. 873, 97th Cong., 2d Sess. 1 (1982), U.S.Code Cong. & Admin.News 1982, p. 3852.

■ Having concluded that the Secretary was justified in holding Valkering accountable under the regulations, we must now determine whether substantial evidence supports the Secretary's conclusion that Valkering violated the regulations. The Secretary concluded that the proof that Valkering was involved in the shipment of the uncertified trees, far surpassed the preponderance of the evidence. *In Re Unique Nursery,* at 57. In reaching his decision, the Secretary relied upon Valkering's pleadings, the testimony at the hearing, and the affidavits of various state and federal officials responsible for the gypsy moth program in the area involved.

Valkering does not dispute that the transactions occurred, nor does Valkering claim that the trees were certified as required by the regulations. Therefore, we conclude that the Secretary's decision was supported by substantial evidence.

## II.

■ Second, Valkering argues that the ALJ's admission of affidavits violated USDA regulations concerning witness testimony and denied it the right to confront and cross-examine the witnesses. The admission of the affidavits neither violated USDA regulations, nor deprived Valkering of its right to cross-examine the witnesses.

USDA regulations state that, in general, "[t]he testimony of witnesses at a hearing shall be on oath or affirmation and subject to cross-examination." 7 C.F.R. § 1.141(g)(1)(i) (1994). The affidavits admitted at Valkering's hearing were given under oath to agency investigators with the statutory authority to take such statements. 7 U.S.C. § 2217 (1988). The USDA sent Valkering a copy of each affidavit months in advance of the hearing. Pursuant to USDA regulations, if Valkering had wished to question any affiant regarding their testimony, it could have requested from the ALJ an order for deposition. 7 C.F.R. § 1.148 (1994). Valkering made no such request. Thus, Valkering was not deprived of its right to cross-examine the USDA's witnesses, but rather forfeited that right.

## III.

Finally, Valkering argues that the Secretary's imposition of a $14,500 penalty was excessive and that the Secretary imposed the fine as punishment for Valkering's appeal and refusal to sign a consent decision. However, Valkering fails to point to anything in the record which would support these allegations.

■ The Secretary "sitting in review of an ALJ's initial decision, is authorized by statute 'to substitute its judgment for that of the ALJ.'" *Farrow v. United States Dept. of Agric.,* 760 F.2d 211, 213 (8th Cir.1985) (quoting *Mattes v. United States,* 721 F.2d

1125, 1129 (7th Cir.1983)); 5 U.S.C. § 557(b) (1988) ("On appeal from or review of the initial decision, the agency has all the powers which it would have in making the initial decision ..."). "The assessment of a penalty is particularly delegated to the administrative agency." *Panhandle Coop. Ass'n, Bridgeport, Neb. v. Envtl. Protection Agency.*, 771 F.2d 1149, 1152 (8th Cir.1985). The Secretary's sanction must be upheld unless " 'it is unwarranted in law' or 'without justification in fact.' " *Id.* (quoting *Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182, 185–186, 93 S.Ct. 1455, 1457–58, 36 L.Ed.2d 142 (1973)).

 The Secretary, in imposing the penalty, considered the " 'nature of the violations in relation to the remedial purposes of the regulatory statute involved, along with all relevant circumstances' " and gave " 'appropriate weight to the recommendations of the administrative officials charged with the responsibility for achieving the congressional purpose.' " *In re Unique Nursery*, at 63–64 (quoting *In re S.S. Farms Linn County, Inc.*, 50 Agric.Dec. 476, 497 (1991), *aff'd, Hickey v. Department of Agric.*, 991 F.2d 803 (9th Cir. 1993) (table)). The Secretary characterized the violations as "extremely serious"; catalogued the pervasive adverse effects that can result from such violations; and commented that the nineteen violations in this case resulted in the shipment of 7,818 trees from a gypsy moth high risk area in Pennsylvania to approximately 60 nonregulated areas. *Id.* at 64.

The PQA and the FPPA authorizes the Secretary to impose civil penalties "not exceeding $1000." 7 U.S.C. § 150gg(b) (1988); 7 U.S.C. § 163 (1988). Based on the seriousness of the offenses, the Secretary found it appropriate to impose a fine for each of the nineteen violations. However, the Secretary reasoned that, with respect to the nine non-K-Mart transactions, Valkering was unaware of the fact that the trees were being shipped from a high risk area, and, therefore, imposed only a $500 penalty for each violation. The Secretary imposed a $1,000 penalty for the ten violations stemming from the K–Mart transactions, because Valkering was aware of the risk.

The Secretary carefully explained why Valkering's violations warranted a civil penalty in access of $5,000. The Secretary's decision was well reasoned and consistent with the purpose of the statute. Valkering offers nothing more than mere speculation in support of its accusation that the Secretary was motivated by a desire to punish it for exercising its right to a hearing and appeal. Thus, we conclude that the Secretary's imposition of the $14,500 civil penalty was within the law and justified by the facts.

For the foregoing reasons, we affirm the Secretary's decision and order.